All right. Oh, yay. Oh, yay. Oh, yay. The Honorable Appellate Court of the 5th District of Stanton, Illinois is now in session. Thank you. Please be seated. Good morning. Thank you all for being here. I'm going to call the special setting of the 5th District Appellate Court to session. We are very happy to be here today for the special setting. This has been discussed for a while. COVID kind of hit everybody hard, so I don't think we've had oral arguments up here, I say up here, around here, for several years. So we're happy to be here. We've got two cases for you all today. We've got one criminal case, which will be heard first, and a civil case that will be heard secondly. There's a few people I'd like to thank before we get started. First, obviously, the staff here at SIU Law School, Dean Davidson, Carly, Holtkamp, Judy Ray, they've been just a wonder to work with in helping us get this special setting done, planned. It took a little bit, but we're happy that they assisted us with that. I'd like to introduce, if they haven't already, we have Jack Flood, our clerk, we have Courtney Coots, who's our senior appellate attorney, our deputy marshal, Danny Braddock, and as you obviously have seen, we've got other marshals that have come from Springfield to help out with security, and I want to thank them for being here with us today. As to the justices, I think every justice that's sitting today has a tie to SIU. I've got Justice James Randy Moore, and I've got Justice Mike McHaney. They are both graduates here of SIU Law School. I am Mark Bowie. I'm the presiding justice for the Fifth District Appellate Court, and I'm honored to serve in that position. Although I didn't graduate from the law school here, I did spend a summer and a semester taking some classes here, so I just lived down the road a little ways in Union County, so I'm close by and have somewhat of a tie. As I stated, we've got two cases set for oral argument today. We are very fortunate today to have four highly, highly experienced attorneys that are going to argue before the court and for you this morning. I know I think three of those also have ties to the law school here, so we're honored and glad to have them here today to take part in this. Our first case today is People v. Graham 519-0219. I'm going to ask counsel if they would please stand up, introduce yourselves for everybody here. So I'm going to start with the state. Good morning. My name is Patrick Daly. I'm the deputy director of the Appellate Prosecutor's Office in Mount Vernon. Seated at the council table with me is Mike Lennox. He's an attorney with the office as well. Thank you. Thank you, counsel. Good morning. My name is Christian Burrell. I'm an attorney. I practice based out of Carbondale. I do primarily criminal practice, and I'm proud to represent Rashawn Graham. Thank you. Counsel, are we ready to proceed? Yes, Your Honor. Then go right ahead. Justices, counsel, distinguished SIU law students, my name is Christian Burrell, and I'm proud to represent Rashawn D. Graham Jr. in this appeal. As the court knows, Mr. Graham was found guilty of two counts, being aggravated discharge of a firearm and an unlawful use of weapons by felon in possession of a weapon. Following his conviction, he was sentenced to 13 years on the aggravated discharge of a firearm, and he was given a consecutive sentence of five years on the unlawful use of weapons felon in possession. The consecutive term was brought under a statute that makes consecutive terms mandatory if one of the offenses for which the defendant was convicted was a Class I, a Class X, or a murder, and the defendant inflicted severe bodily injury. The evidence at trial was two photographs introduced by the state, which Mr. Daley has been kind enough to reproduce in large format for the court here today. They are pictures that depict Montavious Burton, the victim in this case. The first picture shows what appears to be a grazed wound to his forehead, and the second picture appears to show an injury to his wrist. Montavious Burton did not testify at trial in this case. Counsel, how can a bullet hold to somebody's wrist not be severe bodily injury? Well, Judge, we cite cases in our brief where other bullet wounds were found not to be severe bodily injury. We cite, let me see here, we cite Jones where there was a graze of his right cheek, and that was found not to be a severe bodily injury. Well, that's not a graze, right? Well, that's within the trial court's discretion to decide. Just because it's a bullet wound, just because it's a graze, or whether or not it's a graze, it's for the trial court to decide. Counsel, what is our standard of review from the trial court's findings? Our standard of review is the manifest weight of the evidence, and it is very deferential to the trial court. But our argument here is not so much whether the trial court made the right call or the wrong call. Our argument is there wasn't sufficient evidence to make the call. The state cites the People v. Johnson, a Rule 23 opinion from this court, where it noted that it is problematic to engage in a comparative analysis of cases because the standard is so deferential. Basically, it's the trial court's call as long as it's not against the manifest weight of the evidence, which would be whether it was unreasonable, arbitrary, or not based upon the evidence presented. All of the cases cited by the state and the defense, there was more evidence at trial as to the injuries. In almost every case, there was testimony by the victim. In the cases where there wasn't testimony, there were stipulations that were so detailed that it essentially was testimony by the victim. In all of these cases, there was also testimony by the medical providers, by the doctors or the nurses or the records as to the injuries, the nature of the injuries, the diagnosis, the prognosis. There wasn't any of that in this case. In this case, there's those two pictures, and Tenise Radler testified that she saw blood dripping. So, you know, the court could legitimately decide that that was severe bodily injury if it heard from the victim or if it heard from the medical providers and we knew something about how serious these injuries either were or weren't. The picture is worth a thousand words, isn't it? I guess it is, but, you know, in these cases where there was not severe bodily injury found, there was a broken toe from a gunshot wound, a graze from a gunshot wound. In Alvarez, there were still BBs from a shotgun blast in the victim's body. We don't quibble with the standard of review, and we don't quibble with the idea of giving the trial court deference, but it is unreasonable and not based on the evidence. It's against the manifest weight of the evidence if the evidence isn't there to make the decision with. So, counsel, were the photographs admitted? These two photographs were admitted, yes. Are you suggesting that even though they're admitted as evidence, that's still insufficient? I am, because it's speculative. You know, we don't know if Montavious Burton was released from the hospital the minute he walked in because we didn't hear from Montavious or the doctors. We don't know if they put stereo strips on his wounds like they did in some of the cases we cite and sent him back home. If there had been medical provider testimony and if there had been testimony from the victim or at least even a stipulation where we had some records, we would know what these injuries consisted of. But to just look at these two pictures, that's speculation. That's against the manifest weight of the evidence. That's the court looking at the pictures and deciding that, you know, this is severe bodily injury based on things that are not in the record. You know, that's all speculation. The court also seemed to confuse great bodily harm with severe bodily injury. We know from Alvarez that severe bodily injury is more than great bodily harm. We deal with great bodily harm all the time as elements of offenses. Severe bodily injury is maybe not as commonly dealt with. The counsel in that hearing, wasn't that distinction pointed out by the state? And didn't the court correct itself? The distinction was pointed out by the state, but the court did not come around and correct itself and make any specific finding of severe bodily injury. The court said at the sentencing, it said, further based upon the evidence, as the court understands it, the fact that Mr. Burton was transported to the hospital and dropped off at the hospital, and based upon the photographs, as the court understands it, treatment was received. There was no evidence of any treatment admitted. The court's going to find great bodily harm was caused to Mr. Burton. It's the wrong standard. The state pointed that out. The prosecutor pointed out the question at sentencing. And the court came back around and said, that is correct. But the court's finding under that particular statutory section, I may have misspoke and used the incorrect language. The court will find that it was sufficient to trigger mandatory consecutive sentencing in this situation. So the court never really went back and corrected its error when it said great bodily harm. The court said, yeah, I'm going to find that it triggers consecutive sentencing. But the court never made the distinction whether it was making that finding because it found great bodily harm or because it found severe bodily injury. And, counsel, was that brought up again in the motion to reconsider the sentence? I believe it was. It was, yes. And what was the ruling on the motion to reconsider? It was denied. The court felt that it had made the finding. But the case is actually very similar to Alvarez. In Alvarez, following what I presume was a bench trial, the court found great bodily harm and permanent disfigurement because of shotgun BBs left in the victim and his leg. And there was extensive testimony about the injury and the prognosis. And then came around to sentencing and said that the court imposed a 25-year enhancement saying that it had previously found severe bodily injury. But the court had not previously found severe bodily injury. The court had found great bodily harm. It confused the two standards. Alvarez was remanded back to the trial court for reconsideration on whether there was evidence for consecutive sentences to be imposed. And what we would ask for in this case is that the consecutive sentences be vacated or, in the alternative, if the justice is not willing to do that, that it be remanded for reconsideration on this issue. You know, there is great deference given to the trial court. That's correct. But it's got to be based on the evidence presented. And it's analogous to a referee who calls balls or strikes. It's the referee's call, but the referee's got to see the pitch. You know, in this case, we didn't have any medical evidence. We didn't have any victim testimony. We have these two pictures, and we have the idea that blood was dripping. Well, the state cites to People v. Johnson. Yes. And that case was decided only on evidence of photographs. How do you respond to that case cited by the state? In my understanding of People v. Johnson, the Rule 23 opinion from this court out of Perry County was that there was testimony by the victim and by Dr. Hayes, the treating physician. The victim in People v. Johnson testified that she was cut five times, once badly. And Dr. Hayes, her physician, testified that she had several injuries. She had severe bruising. She had memory problems. She was given a CT scan, had a very large, and I'm going to mispronounce this, cephalagia, C-E-P-H-A-L-G-I-A, on the back of her head, which was bleeding between her skull and her skin. Dr. Hayes further testified in that case that he prescribed pain medication, and he considered himself rather conservative about prescribing pain medication, and so that he said his index of suspicion that she was hurt, genuinely pretty hurt, was high. So in Johnson, I mean, the state cites it for the proposition that doing this comparative analysis is troubling because of the great deference given to the trial court. But even in Johnson, you had the victim and you had Dr. Hayes testify as to what the wounds were. You know, it can be difficult to get victims to testify. There's all kinds of real-world problems about getting people served with process, and sometimes victims are not willing to come in. But the medical records aren't going anywhere, and the medical providers aren't going anywhere. They would respond to a subpoena. You could have got anybody from the emergency room or doctors if he was even treated. You know, that's the thing we don't know. You know, it can't be, you can be deferential to the trial court, but we can't be so deferential so as to let them make a decision without any evidence one way or the other. And so for that reason, we'd ask that this court vacate the consecutive sentences or at least remand it back for reconsideration of the severe bodily injury. Additionally, we make some other arguments in our brief about some other issues. Another one was the prior bad acts evidence, the Rule 404B. The day before trial, the state filed a motion to introduce evidence of a whole other shooting that had just happened that was allegedly between Rashawn Graham and Victoria Wilson, one of the victims in, that was the subject of the charges in this case. The charges in this case were that Rashawn Graham discharged a weapon out of a vehicle that Victoria Wilson was in along with Montavious Burton and Denise Radler. Two days before trial, there was a shooting incident at the Amtrak parking lot here in Carbondale. And so the state made a motion and said, we want to introduce the evidence of this shooting, and we also want to introduce evidence of a prior threat made about a month prior, allegedly by Rashawn Graham by clacking two pistols in the direction of Victoria Wilson at Attucks Park, and also introduce evidence of a Facebook message that appeared to be a bribe not to testify from an unidentified person. That evidence, as obviously, can be admitted for reasons other than propensity, and it may have been somewhat relevant, but the probative value was low, especially of the shooting incident. The reason why it was low was the shooting incident didn't involve Rashawn Graham and just Victoria Wilson. There were scores of people in the parking lot because the bars had just closed in Carbondale. You could see 20, 40, 50 people in the parking lot. Another man named, let's see here, another man came around from behind Polly Ice Pizza, and he was shooting at someone in the crowd, and he was chased by Carbondale police officers. During that incident, Silver Mustang left the parking lot of the Amtrak parking lot, and people were in the Silver Mustang and were shooting back at someone in the parking lot. The reason why the probative value is low is Victoria Wilson was allowed to testify that that was Rashawn Graham in that car and that he was shooting at her. The evidence wasn't so clear. We have this other person shooting first from behind Polly Ice Pizza. We have the police involved who were on foot patrol right at the same time chasing him. We have multiple people in the Mustang, and the only person that identified the shooter was Victoria Wilson. Isn't that a credibility question for the jury? It is a credibility question, but it's so incredibly prejudicial that even though it may have had some limited probative value, the prejudicial effect couldn't have been any worse. You couldn't dream up a hypothetical that would be more prejudicial than this. Rashawn Graham's on trial for shooting at Victoria Wilson, and the other crime's evidence is that, oh, by the way, he just shot at me again two nights ago. That is as prejudicial as it gets. Once that was admitted into evidence, the trial was basically over. Well, the other crime's evidence all centered around the central idea or proposition that he was trying to intimidate her not to testify. I understand, and that is correct, and that is a legitimate reason to introduce it. The problem was that the evidence was unclear. You had an incident involving a whole other shooter, scores of people in the parking lot, multiple people in this Mustang. It was a chaotic situation to say the least, and she was allowed to just testify that it was just him shooting at her. Her credibility is an issue, but that really was inherently so prejudicial, and when combined with the denial of a motion to continue, the state made their motion in limine the day before trial and was allowed to introduce this evidence, the public... Counsel, what was the trial date? The trial date must have been about June 18, 2018. I don't have the exact date in front of me. I know the other shooting incident happened June 16, and I believe the trial was June 18. Well, the state, in its brief, indicates that there were five incidents that occurred between May 28, 2018 and June 17, 2018, the day before the trial. So five incidents of attempted intimidation before a trial, don't you think that is probative as to consciousness of guilt? It could be, but I think you need to give the defense counsel a chance to rebut those and not just spring them on the day before trial. The defendant was already in jail being held in custody after this shooting incident on the 18th, just the day before trial. There was no danger to Victoria Wilson by continuing the trial for 30 days. Rashawn Graham was already in jail. He needed a quarter million dollars in cash to get out of jail. He wasn't going to be able to come up with that, and he didn't come up with that. These five events happened over a month, but they were not part of a motion in limine until the day before trial. And that was the month before trial. Yes, yes. It would be analogous if I came in today with my four issues in my brief and said, oh, surprise, Mr. Daly, I have three more issues. You know, to deny the motion to continue, there's no prejudice to the state. In the interest of justice, it should have been continued at least 30 days. Well, wasn't the trial court allowed to conclude, if I grant this continuance, the assistant state's attorney argued in that motion, judge, it's not going to get any better. Wasn't he really saying, you continue this, next time he won't click the guns together, he'll kill her. Well, he did argue that. The problem with that is he is presumed innocent, and it denies him a fair trial by not giving his counsel time to rebut these other evidences, other prior crimes or bad acts. You can't just conclude that he's guilty of these other bad acts and say, well, I'm going to release my child right now, even though you just disclosed this yesterday. There's probably six or eight hours of surveillance video to watch. There's probably five or 10 different Carbondale police officers writing reports. There's scores of witnesses that they interviewed. That's a lot to spring on a trial attorney the day before trial to try to deal with it. He was in jail. He wasn't going to be going around town and doing anything. And Victoria Wilson's safety was something that could have been accomplished by a means less prejudicial to the defendant than denying the motion to continue. But trial counsel was able to cross-examine her regarding her testimony about these alleged incidents of intimidation? Trial counsel did cross-examine her about that, about the alleged incidents of intimidation. The Facebook threat, or the Facebook attempted bribe allegation was sent by someone named Sarah McIntosh on the account. The only evidence that it was the defendant was the context. Victoria Wilson was able to testify that it must be Rashawn Graham because of the context. Isn't context exactly how you authenticate Facebook? It can be, it can be. The real problem with not being, she wasn't able to cross-examine her effectively was the problem because Victoria Wilson had given some extensive video interviews with the Carbondale Police Department following the second shooting. And that's a lot of video to go through and pull out every inconsistency with her testimony at trial. And in fact, we argue that that was ineffective assistance to not cross-examine Victoria Wilson with some of her inconsistencies. It's understandable in a way because it was just given to her the day before trial and that's a lot of information to digest and get in a format where you can impeach somebody with. But nevertheless, she was able to cross-examine her somewhat. We argue that the counsel's performance under an objective standard fell below an objective standard of reasonableness. And the defendant was prejudiced. He was prejudiced because Victoria Wilson's credibility was the sole issue in this aggravated discharge case. She was the one who testified that Rashawn Graham fired the shots at her. The victim didn't testify. It was really whether or not it was Victoria Wilson was believable or not. And so impeaching her credibility was really the defense's main strategy and what the defense had to go on in this case. And when you combine, you know, not only the motion in limine with this incredibly prejudicial other shooting, basically, it's so prejudicial that it goes from other bad acts into propensity evidence. It invites the jury to decide, oh, well, you did it again, so you must have done it the first time. That's propensity evidence. That's not permissible. But did the court not give, if my notes are correct, pattern instruction 3.14? He did. He did give 3.14. And the limiting instructions are always appropriate in a case like that. But I think that that almost gets to be a theoretical remedy to that problem. You can't unring a bell. Once a panel of jurors who are lay people who are not attorneys hear that somebody shot at her again and you're asked to decide whether you shot at her the first time, it's just, I don't think 3.14 can work and alleviate the problem there. You can't unring that bell. Thank you. Before we let you go, counsel, do we have any questions at this time? No. Okay. Obviously, you have your time for rebuttal. Okay, thank you. Counsel, go right ahead. Good morning, counsel. Good morning, your honors, counsel, members of the audience. My name is Patrick Daly with the Appellate Prosecutor's Office and I'm here on behalf of the people of the state of Illinois. With the court's indulgence, I want to go a little bit out of order of counsel's argument. I want to start with the other crimes evidence. A couple of factual timeline issues I want to set forth first of all. So this case was originally set for trial on June the 18th. As is often the case, there's multiple cases set for trial. Another trial was ahead of Mr. Graham's and so that case went on the 18th The state had given the evidence of what had happened the previous weekend to counsel, I believe, and they filed their motion in Liminy on the 19th. So obviously, this is information that's incoming, investigation. It's being handed over as quickly as it can. It's my understanding from the record, and if I'm wrong, I'm wrong, but I'm pretty certain I'm correct. The state had wound up having Mr. Graham recogged. He was not in custody, which would make sense because he's alleged to have conducted his activities prior to trial. So he was not in custody, which I think is what prompted the prosecutor when arguing the motion to continue, you know, a concern about ongoing events and whether this is going to get worse, a legitimate concern. And I'll discuss the motion to continue here a little bit, but... Where can we find that in the record? Earlier in the case, there was an issue regarding discovery. At that point, Mr. Graham was in custody I think that the state was looking at issues perhaps with regards to speedy trial at that point, and so there was an agreement that Mr. Graham be given a recognizance bond, $200,000 perhaps, I believe it was, off the top of my head. And he had been out of custody since that point up until the time of trial. So in one of these incidents near trial, he was not then remanded back into custody? He was not remanded back into custody as far as I'm aware of, no. The... For other crimes evidence, of course, the standard is pretty well established that you can't introduce other crimes evidence strictly for the purpose of showing that a particular defendant has a propensity to commit a criminal act. But there's a wide array of reasons that such evidence can be admitted as long as it doesn't relate to propensity. Some reasons that are typically cited are intent, motive, modus operandi, identity, absence of mistake. But this is a non-exclusive list of reasons that other crimes evidence can be admitted. I want to discuss... And consciousness of guilt. And consciousness of guilt, correct. Absolutely. I do want to get one thing perhaps out of the way right off the bat. So one of the principal theses of the prosecutor in this case was that this was a continuing narrative and cited some case law to that. I'm not going to endorse that rationale. The reason is that the continuing narrative proposition that the evidence that's being introduced is basically part and parcel of the charged crime itself. In other words, it's an ongoing event. I think rationally, we're talking about two separate events. The crime, the shooting, and then separate later acts of intimidation or attempted witness bribery. Regardless of that, and regardless of the fact that the court may have considered that and found that one of the reasons or rationales for admission of the evidence, this court's not bound by that. This is evidence of the record. And one of the things that appears of the record here indisputably is that this is evidence of consciousness of guilt. It's been long held going back to Supreme Court case from the 1940s that the evidence of witness intimidation, people v. Gamboni, evidence of witness intimidation is admissible as other crimes evidence in order to establish consciousness of guilt. Now, I think it's important to review here's abuse of discretion for any decision of the court to allow the admission of evidence. That is obviously a highly deferential standard of review, but I think what I also have to emphasize here is that the court's exercise of its discretion is not backwards. In other words, we don't have a trial, we have the evidence, and then we go back and say, well, here's the evidence, and was this credible or not? What the court does is it's presented with a motion if you will, about the type of evidence that the state was going to introduce. That evidence, as it was presented in a motion and as it was argued before the court where the court makes that determination about whether the evidence is admissible, number one, man May 28th, the defendant, while with another individual, were in the vehicle driving by right there in front of Wilson, Victoria Wilson, a key witness for the state, holding two handguns and clacking them together. Now, in candor, at trial, she only testified about the defendant doing it. There were two cars. The other individual, compatriot of the defendant, was in a different vehicle. The window was rolled up and couldn't see what was going on. But she did testify that right there, in visual range, looking right at her, at the scheduled trial date, original trial date of the 18th before they showed up and found out they weren't going to go until the 20th. Wilson was at the Sticks Bar in Carbondale where the defendant had made threatening gestures imitating the firing of a weapon. Later that evening, by the Amtrak station, and if you kind of visualize Amtrak in that area of Carbondale, if you're familiar with it, there's like parking and then there's like a long alley that kind of runs behind Sticks Bar and that's where the defendant and several others were and had made, or there was display of weapon and shots were being fired which she believed, and I believe she testified consistently that she believed they were being fired in her direction. Also, there were the two other social media communications, only one of which was introduced to trial, which involved communications of a Sarah McIntosh, which the testimony was that Wilson had surmised this as a defendant where she's being offered $5,000 to go away and take a vacation until July and not to appear to testify about that thing that happened in Carbondale. So the court received this, heard argument, and you'll see from the record that the court made a very measured consideration of the arguments of the parties and granted the motion. And I think that when you look at what the state had presented in its motion and what it argued and that the court's consideration is the same, it certainly exercised discretion and I believe that the exercise of that discretion was not arbitrary or unreasonable given the fact that, as other crimes evidence, I think it falls neatly within that category of evidence where a witness is being intimidated or coerced or encouraged not to testify, all of which relate to the perfectly admissible rationale of consciousness of guilt. And as Justice Bouie, I believe, made mention of, the jury did get the instruction 3.14, which is the other crimes instruction. So courts have held that instruction when given contemporaneously with the evidence. I don't recall off the top of my head if it got at the end of the trial as well, but that will have a significant impact in dampening the likelihood of a jury doing something other than what is being admitted for. I believe you said in your brief that it was good. Okay, that must be the case. So I want to then roll back a little bit to the consecutive sentences. I think that what Johnson, and granted Johnson is a Rule 23 order, it's a 2022 Rule 23 order, so it constitutes persuasive authority, but it is also a decision of this court, so I think it's perfectly apropos. Defendant cites a number of cases in his brief sort of detailing other instances where courts have found that there was not serious bodily injury, and then compare and contrast. I think that the tact that Johnson takes, and my citation to Johnson is not necessarily to say, well, look at the injuries in this case, and then look at the injuries  and wow, these are a lot worse than those. I think it goes a little bit deeper than that. I think that what this court is getting at, and I think reasonably and rationally so, is that this court is saying, look, where we have an instance where a court has to consider evidence being serious bodily injury, these cases are sui generis, okay? We're not going to, it's not necessarily reliable or appropriate to say, well, here we got case one, two, three, four, five, and this is different than this, and where do we fall into the stream of cases, and is this worse than that one? I think what the court is saying, what this court is saying is that, look, we're going to be deferential to the trial court, and if these cases are sui generis, then we have to be attentive to the fact that the court's in the best position to make these assessments, and unless it's so palpably wrong, then we're not going to overturn the court's decision. I think that the language that this court used, which I think is interesting, was that evidence may be rationally defensible in one instance and not rationally defensible to others, and we're not going to make that, we're not going to make that determination simply because we may not be rationally defensible to a different set of judges or a different trial court judge. Now, we're not talking about bruises here. We're not talking about cuts. If you look at these photographs, and I think really, when you think of the evidence in this case as presented with the defendant firing a handgun at three people that are inside of a car, and I believe Montavious was the front seat passenger, we got a grazing wound, but I think that really what is striking to me, and I think that's probably what the court found particularly compelling, was people's exhibit number 31. That's not a cut. That is a penetrating bullet wound to the wrist. Okay? Quite clearly so. I will grant defendant's argument is correct. Montavious Burton did not testify, nor was there medical evidence presented. Is a picture worth a thousand words? It must be. That's how the court viewed this, obviously. It considered the evidence. It considered what happened. Montavious was taken to the hospital. I don't know why he didn't testify. There's nothing really in the record to establish that particular aspect of it, but I think that in an instance where if the court's going to look at the question of serious bodily injury, a penetrating bullet wound, I don't know if it's a through and through or not. I don't have that information, but it's clearly a penetrating bullet wound. That's a significant harm. Little doubt about it. Or in any instance, your honors, if the court has to ask itself when it goes back and considers this case, is the trial court's determination that this is seriously bodily injury so palpably wrong? Is it so clearly arbitrary, unreasonable, and not based on the evidence presented that we are going to find that that decision was manifestly wrong and we're going to reverse it? The answer to that is just simply no. I think that the court, having considered the evidence and considered what was presented at trial and the testimony and the nature of the shots and the fact that he had gotten shot, it was reasonable for the court to make that determination of serious bodily injury. And I think that given that particular deference that this court recognized in Johnson that the manifest weight of the evidence standard is the one that this court must adhere to, that the court's decision below should be affirmed on that basis. Well, counsel, going to the opposing point that he brought up about no medical testimony being provided, there is no requirement that medical testimony be presented on this issue. That's correct. It's helpful. I wish we would have had it, but I read lots of records where I wish I would have had this, that, or the other, but I'm not trying the case. I get it after it's done, as do your honors. And these are points that were made, I think, as well to the court below and Mr. Barilla argued the post-trial motion in this case and did an outstanding job. But, I mean, I think the court was, I think, cognizant of that, but nonetheless, again, recognizing that the picture is worth a thousand words and can recognize if the state's only evidence were number 30, I may be making the same argument, but I don't know if it's as good a one argument. But I'm certainly going to make it with regards to 31 because a bullet hole to the wrist is a bullet hole to the wrist and it almost sort of speaks for itself. I don't know, your honor. I mean, to answer that question, it's not a requirement. I do believe it's something that court can consider in its grander assessment, of rigor assessment, of whether this was established or not for purposes. But that is something within the court's, you know, consideration in weighing the manifest weight of the evidence. Now, the motion to continue. So this is one of these issues, your honors. I'm doing this for a long time. And when I read a record and I'm being a trial attorney for a long time as well, have done both, your first gut impression is, wow, let's just continue. And to me, God, the defense counsel is getting this stuff kind of late. Wouldn't you say the eve of trial is a little bit more substantial than kind of late? Yeah. Well, with the qualifier, Justice McKinney, that it was more than kind of late, but it was also timely when you consider when this all happened. But there was a month ago allegation that was also late. Right. That's correct. But the prosecutor addressed that and said, look, at that time, we didn't have a pattern. It wasn't even looking like it was something that the prosecutor was even going to probably pursue until the events that occurred outside, you know, that occurred, you know, really there on that weekend before the trial was scheduled to start on the 18th of June. Well, the state got a motion to continue and they got a second motion to continue because they couldn't find the victim over the defense objection. On the eve of trial, the defense gets hit with this devastating other crimes evidence. Why wouldn't 30 days? Would the world end if you gave them 30 days to flesh this out? No, the world probably wouldn't have ended, although I do think that there are, there certainly is a legitimate concern expressed where we're not talking about 30 days to go find an alibi witness that we think lives somewhere in Carbondale or I've got, you know, a witness coming in from Atlanta and they can't get a plane flight. We're talking about evidence that, granted, the presumption of innocence. I fully accept that. But we also live, we don't live in a vacuum where we can't recognize the particular circumstances in which things are happening and are happening in a way that a court can reasonably recognize as threatening. But I think that one of the, the argument that I make in this case is this. Even, I think, assuming, for the sake of argument, that maybe a judge, one of your honors or any judge, might have looked at this differently and said, well, maybe grant this continuance for 10, 15, 30 days. In the end, in order for this court to get from what I have done this differently to we need to reverse this conviction and remand it for a new trial, we need to establish prejudice. Okay? Now, what's lacking in this case is any concrete evidence of that prejudice. Prejudice... Isn't that because they didn't have time to create that issue, that evidence? They weren't allowed time to conduct discovery and find out if there was other evidence. I mean, that Amtrak deal, that was Dodge City on a Saturday night after a cattle drive. It was a wild, wild west. That may be true, Your Honor, and I certainly, I would certainly concede that point, but by the same token, we, when we get to this point where we're saying, okay, are we going to reverse this conviction on the basis of the fact that there is no continuance granted, in order to establish prejudice, we're going to have to be able to also make an assessment of, okay, absent this ability to get a continuance, what was the defense deprived in this case? Now, and I, I would note that when this case eventually came to a post-trial motion hearing, it was about six to seven months post-verdict. If there's something out there that would have or could have or should have been presented, it would probably have been a good time to present it then, but at that point, we're still left only with the argument that, well, counsel could have done this, could have done that, could have done whatever. Well, I mean, I don't know, right? We don't know what that evidence is. There may be nothing at all. Are we going to, because we're going to say, I would have done this differently without actually anything in our grasp, in our hands, either through a direct or a collateral attack that says, okay, well, but for this, but for this lack of continuance, but for this inability to drum up something, this trial would have been significantly different, and that's why, you know, I think that the prejudice aspect of it is something that has to be focused on here, and maybe we can't develop that prejudice now, which is why we have the Post-Conviction Hearing Act procedure, but I would think that after six or seven months, if we're going to argue that the defendant was substantially denied a fair trial, we would at least have the testimony of the defense counsel to say, well, I would have done this, I would have done that. We would have had an affidavit from witnesses. We would have had something, but instead, what we have essentially is argument that, well, there's lots of people there. I mean, lots of evidence could have been developed. There's other witnesses. People could have been interviewed. Who? I don't know. We still don't know who that is, and if we're going to send something back for a new trial on the basis that maybe could have, would have, should have, something that's out there, that's a slender reed in which to hang a conviction reversal on these serious crimes. I'm not saying a canter won't ever be developed, but we don't have a record here to establish that prejudice. So what is our standard of review on the denial of the motion to continue? The standard of review for denial of motion to continue is abuse of discretion. That's a very deferential statement. It's a very deferential. I, in my second moment of candor, I will say that I wish that Judge Bloodworth had been a little bit more explicit in his rationale for denying the motion to continue. One just may presume that it was based upon the arguments presented by the party. He revisited that motion to continue mid-trial. You may know when they presented the other crimes evidence, counsel for the defendant did say, I didn't get a chance to investigate this. And the court said, anyway, we've been through that. And then in post-trial as well, the court held to its earlier ruling that it was standing by its decision to deny the motion to continue.  and I think you point out in your brief that the opposing counsel talks about the factors that the trial court should consider granting a motion to deny the motion to continue. Correct. And I think one of those being the surprise of... Thank you. Did that mean I've cut off? No, just me, Judge. Basically, as I note in your brief, the surprise was entirely  defendant's own doing. And that's correct. And if I may just finish to answer the question, Your Honors. Yeah, that's one of the considerations among several. And I think the prosecutor did a good job of sort of elucidating those rationales. But I do think that the fallback to all that whether the court agrees or not is we're still going to have to get to that prejudice aspect of it. And I think that that's again, something that if the court can't stand back and say absent this continuance, I mean, we have instances where it's fairly patent from the evidence that this continuance is prejudicial. All right? A new attorney is appointed after an attorney withdraws on the day of trial and the judge says, oh, I know you don't have discovery yet, but we're going ahead with this trial anyway. Okay? That's not a hard thing to do. This is a case where and I think that also, excuse me, part of that prejudice aspect of it, I'm going longer than I intended to, but just finish this one thought, is that you do have to look at the performance of trial counsel as well. And I think trial counsel did an able job in presenting the defense of this case and including confronting that new evidence that the state had presented, which was by the defendant's own doing allegedly. No further questions, Your Honor. I appreciate your time. Thank you. Before we let you go, Justice Moore, Justice McKinney, any questions? No further questions. Thank you, Your Honor. Thank you. Mr. Brill, go right ahead with your rebuttal. Thank you. To follow up on the points just made and the questions from the jury,   really important to say that there is multiple people involved. Brett Jones was shooting. People were shooting from a Mustang. There was a car crash at the intersection of West Walnut and 13. It's part of the pursuit. The defendant did this. It's his fault. It's a surprise. It hinges on only believing Victoria Wilson's account. There was nobody else that offered testimony that it was Rashawn Graham shooting. What was the question?  multiple people involved. You have multiple people in this Mustang. You can't prepare for that on the day when you're ready to go to trial. Whether there would have been affidavits to exonerate the defendant doesn't eliminate the prejudice that's created. Whether or not Rashawn Graham was in custody, I could be wrong on that issue. Even if he wasn't in custody, there were other tools to alleviate the security issue. The judge was free to revoke his bond. I imagine his bond would have been revoked under any circumstances. You don't have to deny the motion to continue and force the trial attorney to go to trial with multiple witnesses and video interviews just to keep the defendant contained. A motion to revoke bond could have accomplished that as well. As far as a picture being worth a thousand words, that's speculation. Whose words? Oh, yeah, that's definitely a penetrating gunshot wound and we had to treat him and his wrist will never be the same. That's one possibility. Oh, no, that's not a penetrating gunshot wound. We're going to clean it up and send him home. He's fine. We don't know what the words were going to be. To say a picture is worth a thousand words, whose words? Words that help the defendant or the prosecutor? The state invites the court to make a bright line rule that says if there's a gunshot wound it's severe bodily injury. In Durham there was a gunshot wound found to be not severe bodily injury. In people versus Murray there was a gunshot wound that broke the victim's toe. That was found not to be severe bodily injury. Just because it's a gunshot wound doesn't mean it's severe bodily injury. It's appropriate to give the evidence standard. The evidence should be more than two pictures and testimony that there was blood. Obviously there was blood. My kids fall down and scrape their knees. Is it severe bodily injury? No. They would probably say it is but it's not. It can be difficult to get victims to testify. It's not difficult to get the physicians to testify. We have medical records, physicians, nurses. We can get anyone in there for the state. What did it consist of? What was the prognosis? Did you discharge him the minute he came in the door? We don't know. It's a mystery. Thank you. Thank you, counsel. Any final questions? Justice Moore or Justice McCain? No questions. All right. Thank you, counsel. Obviously we will take the matter under advisement and we will issue an order